IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Criminal Action No. 11-cr-00038-JLK-CBS

UNITED STATES OF AMERICA,

      Plaintiff,

v.

GARY DOUGLAS WATLAND,

      Defendant.

---

## RECOMMENDATION REGARDING MOTION
## REQUESTING SANCTION FOR NON-COMPLIANCE

---

Magistrate Judge Shaffer

Pending before this court is the United States' Motion Requesting Sanction for Non-Compliance (doc. #512), filed on June 22, 2012. In summary, the government's motion takes exception to many of the discovery requests propounded by Defendant Gary Douglas Watland, arguing that those requests are phrased "broadly without sufficient clarity to provide reasonable notice of what was sought and why the information would be material to the case."[1] The instant motion focuses particular attention on Request No. 66, for which "no such showing of

---

[1]The instant motion also takes exception to my May 16, 2012 Order (doc. #476) to the extent it required the government to provide an affidavit detailing its efforts to find responsive documents. The government maintains that such a requirement "contradicts the procedures set out in Rule 16 as to the function of the Court in regulating discovery." *But see United States v. Feliciano*, 998 F. Supp. 166, 169 (D. Conn. 1998) (holding that "[a] federal court, guided by considerations of justice, may exercise its supervisory powers to formulate procedural rules not mandated by the Constitution [or statute]"). I will address that aspect of the Motion Requesting Sanction in a separate order to follow.

materiality has been submitted by the defense." The government argues that Mr. Watland's failure to satisfy the materiality requirement incorporated in Fed. R. Crim. 16 and *Brady v. Maryland*, 373 U.S. 83 (1963) is further exacerbated by the district judge's directive on August 9, 2011 that the United States "leave no stone unturned in the discovery process." The United States suggests that the lack of materiality supporting Mr. Watland's discovery requests generally, and Request No. 66 in particular, together with the discovery orders entered by the district judge and this magistrate judge, forces the government to undertake "tremendous burdens" that cannot be resolved without an opportunity "to contest these decisions by the imposition of a sanction."

Defendant Watland filed his Response (doc. #529) on July, 13, 2012, and the United States submitted a Reply to Watland's Response to Request for Sanctions (doc. #537) on July 25, 2012. This court held a hearing (doc. #632) on October 19, 2012 to consider this and other motions. At the conclusion of that hearing, I advised counsel I would address the government's Motion Requesting Sanction in a written recommendation, as the United States has invited a sanction as severe as dismissal of the Notice to Intent to seek a death sentence in this case.[2]

On December 16, 2011, pursuant to an Order of Reference to Magistrate Judge in Criminal Case (doc. #293), Judge Kane authorized me to "conduct proceedings, issue orders, and convene such conferences and hearings as . . . deem[ed] necessary to oversee, manage, and compel compliance with the existing orders in this case and any additional case management plans or orders that" may be entered in the future. In preparing this Order, I remain mindful of

---

[2]Pursuant to 28 U.S.C. § 636(b)(1)(A), a magistrate judge may determine any pretrial matter pending before the court except, *inter alia*, a motion to dismiss an indictment or to suppress evidence in a criminal case.

the discovery orders previously entered by Judge Kane and the pertinent arguments raised by the

parties over the course of the pretrial process.  I also believe that Judge Kane expects me to

exercise my considered judgment in a manner consistent with pertinent statutes, prevailing case

law, due process requirements, and common sense.  Starting from that perspective, the court has

reviewed the motion and related briefing, together with the attached exhibits, the entire case file,

and the applicable law, and is sufficiently advised in the premises.

## BACKGROUND

The procedural history of this litigation is well known to the parties and does not bear

repeating here.  The court will only recite those facts necessary to place the instant motion in the

proper context.

On August 7, 2007, Defendant Watland pled guilty to attempted escape and other related

charges stemming from a foiled plan to escape from the Maine State Prison where he was

serving a 25-year sentence for murder.  On January 28, 2008, custody of Mr. Watland was

transferred from the Maine Department of Corrections to the Federal Bureau of Prisons (BOP)

with his arrival at the U.S. Penitentiary in Beaumont, Texas (USP Beaumont).  *See*

Government's Status Report Concerning Discovery (doc. #311), at 2.  Mr. Watland was

transferred to the U.S. Penitentiary in Florence, Colorado (USP Florence) on June 10, 2008.

> Less than two months earlier, on April 20, 2008, . . . a race riot had occurred at
> USP Florence.  The Bureau of Prisons (BOP) was required to quell the riot,
> resulting in two deaths and multiple injuries.  USP Florence was still very tense
> and very violent when Mr. Watland arrived there in June 2008.  Prison life was
> dominated by gangs.

*See* Defendant Watland's Motion for Specific Discovery and *Brady* Material and Information

(hereinafter "Defendant's Motion for Discovery"), at 2.  Based upon disciplinary violations, Mr.

Watland was confined in the Special Housing Unit at USP Florence for much of the period from

June 10, 2008 through August 6, 2008, when he was released to general population.

> Before he could even get back to his cell, Mr. Watland was confronted by inmate Mark Baker, the victim of the alleged murder charged in the Indictment.  Mr. Baker was a member of the Nazi Low Riders (NLR) gang.  During the August 6, confrontation, Mr. Baker threatened Mr. Watland's life, placing Mr. Watland in a "kill or be killed" situation.  Evidence provided in discovery shows that four days later, on August 10, 2008, Mr. Watland stabbed Mr. Baker several times in the neck and the back, killing him. . . . That same day, August 10, 2008, just prior to the Baker killing, there were two other inmate-on-inmate assaults that occurred at USP Florence in different locations.  Mr. Watland was not involved in either of those two other altercations.  However, information obtained in discovery suggests that the government believes that these two assaults and the killing of Mr. Baker were connected.

*Id.* at 2-3.

On January 25, 2011, the federal grand jury for the District of Colorado returned a one-

count Indictment (doc. #1) charging Mr. Watland with a violation of 18 U.S.C. § 1111 in

connection with the willful and premeditated killing of inmate Mark James Baker.  The

Indictment also includes special findings pursuant to 18 U.S.C. § 3591(a)(2)(A), (B), (C) and

(D), and 18 U.S.C. § 3592(c)(2), (3), (4) and (9).  The United States filed a Notice of Intent to

Seek the Death Penalty (doc. #25) and an Amended Notice of Intent to Seek the Death Penalty

(doc. #381) on March 1, 2011 and February 29, 2012, respectively.

On June 1, 2011, Defendant Watland filed his request for discovery pursuant to Fed. R.

Crim. P. 16 and *Brady*, including Request No. 66, which specifically sought production of "[a]ny

and all documents relating to inmate-on-inmate stabbings in BOP institutions from August 10,

1998 through December 31, 2010, including without limitation, documents relating to inmates

who suffered multiple stab wounds but did not die from those wounds."[3]  *See* Defendant's Motion for Discovery, at 28.

In response to Mr. Watland's Request No. 66, the government indicated that it would provide "statistical data concerning inmate on inmate assaults that involved multiple stab wounds that did not result in death."  However, "to the extent that [Request No. 66] seeks the investigative files of all the SIS units in BOP, the FBI investigative files, and the investigative files of other investigative agencies," the United States "request[ed] specific disclosures by defendant Watland establishing [the] materiality of the request before the government is compelled to produce the material."  *See* Response by Government to Motion for Discovery (doc. #111), at 3 and 31-32.  The government's June 21, 2011 response brief did not address the legal and factual analysis advanced in Defendant Watland's motion.  More to the point, the government's response brief did not cite any case law in support of its position that Mr. Watland must "establish materiality" before the government could be compelled to comply with its *Brady* obligation.  During oral argument on Defendant Watland's motion, government counsel simply noted the previous objection "to the production of assaults, 101 code violations, 104 code violaions, that were nationwide, that did not pertain to U.S.P. Florence."  *See* Transcript of Proceedings on August 9, 2011(doc. #167), at 48.

At the conclusion of a hearing on August 9, 2011, Judge Kane granted Defendant

---

[3]Defendant Watland's motion broadly defined "document" to include "without limitation, and whether in electronic or paper format, the following: correspondence, email communications, memoranda, reports, handwritten notes, photographs, electronic computer entries, audio recordings, video records, audiovisual recordings, spreadsheets and other compilations of data, slideshows and/or PowerPoint presentations, as well as drafts and final versions of each of these items."

Watland's "motion in every particular," after observing that "overall judicial policy as set forth . . . in the Supreme Court opinions and, clearly, in opinions from circuit courts of appeal, that we are to leave no stone unturned in the discovery process of death penalty cases." *Id*. at 56-57.  On September 20, 2011, the United States filed a Motion to Modify Discovery Order (doc. #189), to the extent that Judge Kane's August 9, 2011 Order "directed the government to provide to defendant Watland unredacted or complete versions of all documents produced by the government."  This post-hearing motion did not ask the district court to reconsider in any way its directive that prosecutors "leave no stone unturned" in responding to discovery requests.

On December 15, 2011, Defendant Watland filed an Interim Status Report (doc. #289) challenging the adequacy of the government's production of discovery and *Brady* material.  With respect to Request No. 66, defense counsel reported that the United States had identified approximately 4513 pages of responsive documents found within four Bates ranges.  Defendant Watland's Interim Status Report advised that only three of these four Bates ranges had been produced to the defense.

This court entered a Minute Order (doc. #301) on December 19, 2011 directing the parties to file "either jointly or separately a status report that addresses: (1) what discovery has taken place, (2) what discovery remains outstanding, and (3) what, if any, discovery issues presently exist."  Consistent with that directive, Defendant Watland filed a Status Report (doc. #310) on December 29, 2011.  Defendant complained that since filing his earlier Interim Status Report on December 15, 2011, the government had not produced any additional discovery or *Brady* material.  The United States filed its Status Report Concerning Discovery (doc. #311) also on December 29, 2011.  In that report, the government indicated that it had produced more than

31,000 pages of materials and 75 videos in 15 separate installments since Judge Kane's Order on August 9, 2011.  As to Request No. 66, the government indicated that while "BOP records of these assaults are incomplete," the following documents had been produced:

>502-503628 through 502_503635
>514_515669 through 514_518381
>515_518382 through 515_520172
>517_526926 through 517_526986

*See* Exhibit 1 (doc. #331-1) at page 34 of 39, attached to Government's Status Report Concerning Discovery.[4]

I addressed the government's production in response to Request No. 66, in addition to other requests, during a hearing on March 14, 2012.  At that hearing, government counsel advanced for the first time his understanding that Request No. 66 was limited to BOP facilities located in Florence and Englewood, Colorado.  *See* Transcript of Proceedings on March 14, 2012 (doc. #504), at 113-114.  In response, the court noted the lack of any geographical limitations in Request No. 66 and the unequivocal Order entered by Judge Kane on August 9, 2011.  Government counsel advised the court that he would need "one day to figure out how long its going to take" to respond to Request No. 66 on a nationwide basis.  *Id.* at 116.  I directed government counsel to confer with BOP and FBI representatives by noon on March 19, 2012.

>I will require you and Ms. Johnson, or one or more representatives of the defense team, to then put together a telephone conference call with me for a time that's convenient on your schedule and mine for the afternoon of March 19th.  You, at that time, will tell me how much time its projected to take and then we'll figure

---

[4]The United States filed a further Status Report Concerning Discovery as of January 17, 2012 (doc. #323) in which its represented that "additional records in paper format have been retrieved from storage and will be provided on or before 1-23-12" in response to Request No. 66.

> out whether or not we can come up with some sort of phased approach so that we
> can get stuff on a rolling basis. . . . But find out by March 19 what it's going to
> take to do this production . . . and we'll talk about how we're going to stage it.

*Id.* at 117-118.

During the telephone conference on March 19, 2012, government counsel advised that

the FBI had identified 1,739 files in paper form relating to inmate-on-inmate stabbings in BOP

facilities from August 1998 through December 31, 2010, which would require an estimated

1,649 hours to compile and produce.  As for BOP records responsive to Request No. 66, counsel

advised there were 49,119 inmate-on-inmate assaults during the requested period, but that BOP

had not starting categorizing assaults by type of weapon used until May 2000.  According to

government counsel, between May 2000 and December 2010 there were 6,322 inmate assaults

involving some type of penetrating weapon.  Counsel estimated that a review of the latter files

would require 5,310 hours.  In light of the representations of government counsel, this court

emphasized that it was not making a rulings as "there's right now nothing in front of me that I

could rule on."  *See* Transcript of Proceedings on March 19, 2012 (doc. #44), at 7.  However, I

specifically asked Mr. Watland's counsel to explain "the relevance of assaults or information

about assaults post-August 2008."  *Id.*  Defense counsel suggested that the post-August 2008

information "could be relevant to, for instance, whether or not [Mr. Watland] could be housed

safety.  It could be relevant to other stabbings in which the government did not seek the death

penalty or it was not obtained, off the top of my head."  *Id.* at 8.

Mr. Watland's counsel then stated that

> . . . I certainly don't blame Mr. Carey for this, but I would – I would like some
> time to think about these numbers, and I know your Honor is not generally
> agreeable to giving us – you understand we want to push the ball forward here,
> but I'm wondering if the Court would be willing to give us until tomorrow to

8

think about this and to talk to Mr. Carey about how to perhaps narrow this search.

*Id.* at 10.  In response to that overture, I observed that

> . . . to some extent, the defense theory makes perfect sense. . . . [I]f the defense theory is that Mr. Watland had a heightened sense of fear or apprehension or heightened sense of awareness, I don't know that we need to go back in time . . . as far back as 1998. . . . [I] n other words, if he had a heightened awareness when he got to Beaumont in January of 2008, Mr. Watland's heightened awareness of the danger of being in a federal penitentiary can be established without going all the way back to 1998.  Also, it would seem to me that if Mr. Watland's theory is heightened awareness, or if his theory is failure to protect, or if his theory is – you know, the ability to protect and eliminate the danger short of a death penalty, I don't know that you need to go and look at stabbings at federal prison camps.  It would seem to me that the parties, at least as an initial threshold, could say let's focus on stabbings at ADX and U.S. penitentiaries, because those are going to be the prison populations most analogous to Mr. Watland and most comparable for purposes of the arguments that Mr. Watland wants to make, and let's cover a period – let's say, as an initial threshold, let's search 2005 to 2010. . . .

> [DEFENSE COUNSEL]: . . . We are happy to sit down with Mr. Carey to see if there is some way that [Request No. 66] can be narrowed or staged in some what that makes it more doable.  I don't want to be understood as saying [Request No.] 66 was ordered, just do it.  You know, we understand the problems, and we would – we're willing to try to work with the United States attorney to come up with some solution that is doable by them that meets our needs.

*See* Transcript of Proceedings on March 19, 2012 (doc. #446), at 12-14.

I reminded counsel on March 19, 2012 of the current posture of discovery and noted that neither party had filed any motion that required me to offer more than suggestions.  However, government counsel on March 19, 2012 acknowledged that the United States "is in the process of drafting a motion."  Again, I urged counsel for both sides to take a more cooperative perspective.

> I will tell you, Mr. Carey, I think within this total universe of discovery in [Request No.] 66 there is an element that is very relevant and properly discoverable, but I'll tell you, Mr. Chambers, that the logic of the defendant's

position becomes a bit strained when we're talking about going all the way back to 1998.  And so what I would suggest, gentlemen, is figure out if there's some way that you can square the circle.  If you can't, then the government is apparently going to file a motion, and that will frame the issue as well as anything else.

*Id.* at 16.

On March 22, 2012, the United States filed a Motion for Reconsideration of the Court's Order Concerning Discovery of Records Relating to Stabbings in BOP Facilities (doc. #413).  In challenging Judge Kane's Order granting Defendant's Motion for Discovery, the government argued that during the August 9, 2011 hearing, "the issue of materiality was questioned by the government, and Watland's explanation was sparse."  That statement conspicuously failed to acknowledge the complete absence of legal analysis or citations to controlling case law in the government's June 21, 2011 response to Defendant's motion for Rule 16 and *Brady* disclosures.[5] A careful review of the August 9, 2011 transcript reveals that government counsel's argument was short on specifics and devoid of any discussion of controlling precedents.  The government's Motion for Reconsideration also conspicuously failed to discuss the colloquy on March 19, 2012, during which this court expressed concern over the scope of Request No. 66 and encouraged counsel for both sides to re-examine their positions.  In moving for reconsideration, the government argued that "[t]he Court should not permit Watland to undertake a broad fishing expedition, at public expense, without first making a meaningful showing of materiality."  In short, the Motion for Reconsideration renewed the objection to the nationwide

---

[5]For example, the June 21, 2011 Response by Government to Motion for Discovery does not include any of the cases cited in the United States' March 22, 2012 Motion for Reconsideration.  *But see Servants of Paraclete v. Does*, 204 F.3d 1005, 1012 (10th Cir. 2000) (suggesting that a motion for reconsideration is not an appropriate method "to revisit issues already addressed or advance arguments that could have been raised in prior briefing").

scope of Request No. 66 as unduly burdensome[6] and asserted the government's right to

unilaterally determine what satisfies the materiality standard for purposes of Rule 16 and *Brady*.


This court held a hearing on the government's Motion for Reconsideration on May 15-

16, 2012.  During that hearing, I denied the government's Motion for Reconsideration for the

reasons stated on the record after finding that the government had not established good cause or

adequate grounds for the requested relief.  Once again, I expressed the view that while the

government should "produce responsive information for institutions and facilit[ies] beyond the

boundaries of Colorado . . . I do believe there has to be some rationality to this process."  *See*

Transcript of Proceedings on May 16, 2012 (doc. #492), at 166.  This court directed the

government to produce all information with respect to stabbings at BOP facilities for the

requested time period, but to do so in phases.[7]  *See* Transcript of Proceedings on May 16, 2012

(doc. #492), at 167.  After the government produced information for the specific BOP facilities

where Mr. Watland was housed, and then provided information for all other United States

---

[6]Notably, the government's Motion for Reconsideration focused on the burdens associated with a nationwide production of documents responsive to Request No. 66, to the exclusion of all other courses of action.  For example, the motion and attached exhibits do not address to what extent the burdens of production might be reduced if disclosures were limited to inmate-on-inmate stabbings at United States penitentiaries during the period between August 10, 2005 and August 10, 2008, related BOP Form 583s (Report of Incident), and records documenting any administrative or criminal sanctions imposed on the inmate-assailants involved in those incidents.

[7]*Cf. United States v. Stein*, 424 F. Supp. 2d 720, 726-27 (S.D.N.Y. 2006) (in addressing pretrial motions for *Brady* material, noted that the "trial court 'has broad latitude . . . to carry out successfully its mandate to effectuate, as far as possible, the speedy and orderly administration of justice;'" suggested that as a "matter of sound case management," the trial court has the discretion to determine "what disclosure order, if any, it deems appropriate as a matter of case management").

penitentiaries, "counsel for the parties should contact this court and we will discuss, based upon the information disclosed in Phase 1 and Phase 2, and the previously disclosed information for Colorado, to what extent and, if any, on what schedule the remaining information will take place." *Id.* at 168.  I required the government to provide the Phase I disclosures by June 6, 2012, approximately ten months after entry of Judge Kane's August 9, 20122 Order.

On May 30, 2012, the United States filed an Objection to my May 16, 2012 ruling from the bench.  The government essentially reiterated the arguments advanced in its earlier Motion for Reconsideration and "invite[d] the sanction of dismissal so that further review can be obtained and this issue conclusively resolved."[8]  *See* Government's Objections to the Order of Magistrate Judge Shaffer Stated on the Record on May 16, 2012 (doc. #480), at 14.  During a hearing on June 6, 2012, Judge Kane overruled the objections to my Order of May 16, 2012.  *See* Transcript of Proceedings on June 6, 2012 (doc. #498), at 8.  At the conclusion of that hearing, Judge Kane advised the United States that he was not inclined to act precipitously with respect to the issue of sanctions and would defer any further consideration of sanctions.  However, Judge Kane was equally clear in his unwillingness to "go through all the work in this case, all the work we've done in the past and that lies ahead and go through picking a special jury and then having a trial and then having it reversed because there was some failure to provide information to the defense.  That is simply not going to happen." *Id.* at 11.

The United States filed the instant Motion for Sanctions on June 22, 2012.

**ANALYSIS**

---

[8]The Objection fails to explain why the district court should have any confidence in the government's inclination to comply with a potentially adverse interlocutory ruling by the Tenth Circuit.

Defense counsel made passing reference in her client's initial Motion for Discovery to Rule 16 of the Federal Rules of Criminal Procedure, stating in conclusory fashion that "the items of discovery requested herein are material to the preparation of Mr. Watland's defense of the guilt-innocence phase of the trial and the penalty phase of the trial."  While Defendant's motion and legal analysis focused almost exclusively on the government's disclosure obligation under *Brady*, I will start this Recommendation by briefly addressing the disclosures required by Rule 16.

Rule 16(a)(1)(E) of the Federal Rules of Criminal Procedure requires the government, upon request by the defendant, to produce, *inter alia*, any documents, data, or tangible things in the government's possession, custody or control that (1) are material to preparing the defense or (2) the government intends to use in its case-in-chief at trial.[9]  "[I]n the context of Rule 16, 'the defendant's defense' means the defendant's response to the Government's case in chief.'" *United States v. Armstrong*, 517 U.S. 456, 462 (1996).  To establish materiality for purposes of Rule 16(a)(1)(E), the defendant must demonstrate "there is a strong indication that [the requested evidence] will play an important role in uncovering admissible evidence, aiding witness

---

[9]Rule 16 further provides that the court may, for good cause, deny, restrict or defer discovery or inspection, "or grant other appropriate relief."  Fed. R. Crim. 16(d)(1).  In the event a party fails to comply with its obligations under Rule 16, the court may,

> (A)  order that party to permit the discovery or inspection; specify its time, place and manner; and prescribe other just terms and conditions;
> (B)  grant a continuance;
> (C)  prohibit that party from introducing the undisclosed evidence; or
> (D)  enter any other order that is just under the circumstances.

Fed. R. Crim. 16(d)(2).  *See also United States v. Rivera*, 478 Fed. Appx. 509, 510 (10th Cir. 2012) ("A district court has wide discretion in fashioning an appropriate remedy for Rule 16 violations . . . .").

preparation, corroborating testimony, or assisting impeachment or rebuttal." *United States v. Caro*, 597 F.3d 608, 621 (4th Cir. 2010), quoting *United States v. Lloyd*, 992 F.2d 348, 351 (D.C. Cir. 1993). *See also United States v. Scott*, 1993 WL 411596, at *3 (10th Cir. Oct. 8, 1993) (to satisfy the materiality requirement in Rule 16(a)(1)(E), the "defendant must demonstrate 'some indication that the pretrial disclosure of the disputed evidence would have enabled the defendant significantly to alter the quantum of proof in his favor'"); *United States v. Lujan*, 530 F. Supp. 2d 1224, 1234 (D.N.M. 2008) ("To show materiality, the evidence must bear some abstract logical relationship to the issues in the case such that pretrial disclosure would enable the defendant significantly to alter the quantum of proof in his favor").

Given the conclusory statements set forth in Defendant's June 1, 2011 Motion for Discovery, I conclude that Mr. Watland failed to provide the materiality showing required by Rule 16(a)(1)(E). At this time, I do not believe there is a sufficient basis to impose sanctions or other relief under Rule 16(d).

Defendant's *Brady* requests stand on a different footing. It is well-settled that the government has an affirmative duty to disclose evidence favorable to a defendant. In *Brady v. Maryland*, 373 U.S. 83, 87 (1963), the Supreme Court held that "suppression of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." To establish a due process violation, *Brady* required that the suppressed evidence be (1) favorable to the defendant, and (2) material either to guilt or punishment. The Supreme Court cautioned that

> A prosecution that withholds evidence on demand of an accused which, if made available, would tend to exculpate him or reduce the penalty helps shape a trial that bears heavily on the defendant. That casts the prosecutor in the role of an architect of a proceeding that does not comport with the standards of justice . . . .

14

*Id.* at 87-88.

Several years later, in *United States v. Agurs*, 427 U.S. 97 (1976), the Supreme Court acknowledged that the government's disclosure obligation under *Brady* is not absolute or infinitely elastic.  As the Supreme Court conceded, "[i]f everything that *might* influence a jury must be disclosed, the only way a prosecutor could discharge his constitutional duty would be to allow complete discovery of his files as a matter of routine practice."  *Id.* at 108-109 (suggesting that such a "constitutional standard of materiality approaches the 'sporting theory of justice' which the Court expressly rejected in Brady").  "Whether or not procedural rules authorizing such broad discovery might be desirable, the Constitution surely does not demand that much."  *Id.*

The Supreme Court again re-visited the contours of the *Brady* rule in *United States v. Bagley*, 473 U.S. 667 (1985).  There, the Court acknowledged that due process does not require the prosecutor "to deliver his entire file to defense counsel."  *Cf. Weatherford v. Bursey*, 429 U.S. 545, 559 (1977) (noting that the due process concerns underpinning the government's *Brad*y obligation do not translate into a general constitutional right to discovery in a criminal case).  *See also United States v. Beasley*, 576 F.2d 626, 630 (5th Cir. 1978) ("*Brady* is not a discovery rule, but a rule of fairness and minimum prosecutorial obligation"); *United States v. Wright*, 43 F.3d 491, 496 (10th Cir. 1994) (rather than mandating production of the prosecutor's entire file, *Brady* only requires that the government disclose evidence that is "favorable to the accused, that if suppressed, would derive the defendant of a fair trial").  Writing for the entire Court, Justice Blackmun observed that *Brady* required reversal of a conviction "only if the evidence is material in the sense that its suppression undermines confidence in the outcome of

the trial." *Bagley*, 473 U.S. at 679.  In a separate part of the opinion, in which he was joined by

Justice O'Connor, Blackmun proposed the following standard for measuring materiality in the

*Brady* context:

> The evidence is material only if there a reasonable probability that, had the
> evidence been disclosed to the defense, the result of the proceeding would have
> been different.  A "reasonable probability" is a probability sufficient to undermine
> confidence in the outcome.

*Id.* at 682.  To satisfy this materiality standard, the defense must show more than a "mere

possibility" that the evidence at issue is exculpatory.  *United States v. Fleming*, 19 F.3d 1325,

1331 (10th Cir. 1994).

The materiality standard under *Brady* was addressed by the Supreme Court once again in

*Kyles v. Whitley*, 514 U.S. 419, 433-34 (1995).  Elaborating on the analysis advanced in *Bagley*,

the Court explained that "materiality" does not hinge on

> whether the defendant would more likely than not have received a different
> verdict with the evidence, but whether in its absence he received a fair trial,
> understood as a trial resulting in a verdict worthy of confidence.  A "reasonable
> probability" of a different result is accordingly shown when the government's
> evidentiary suppression "undermines confidence in the outcome of the trial." . . .
> One does not show a *Brady* violation by demonstrating that some of the
> inculpatory evidence should have been excluded, but by showing that the
> favorable evidence could reasonably be taken to put the whole case in such a
> different light as to undermine confidence in the verdict.

*Id.* at 434-35.

Ruling in the context of a capital murder post-conviction appeal, the Supreme Court in

*Kyles* stressed that the materiality of any suppressed evidence must be assessed "collectively, not

item by item," because "the Constitution is not violated every time the government fails or

16

chooses not to disclose evidence that might prove helpful to the defense."[10]  *Id.* at 436-37.

However, the Supreme Court also alluded to the government's exercise of discretion during the

pretrial phase of the litigation.  "[T]he prosecution, which alone can know what is undisclosed,

must be assigned the consequent responsibility to *gauge the likely net effect* of all such evidence

and make disclosure when the point of 'reasonable probability' is reached.  This in turn means

that the individual prosecutor has a duty to learn of any favorable evidence known to the others

acting on the government's behalf in the case, including the police."  *Id*. at 437-38 (emphasis

added).  *Brady* necessarily requires the government to make "judgment calls about what would

count as favorable evidence" in light of the existing or "*potential evidentiary record*."  *Id.* at 439

(emphasis added).  However, it is also clear that the defendant ultimately has the burden of

establishing a *Brady* violation.  *Foster v. Ward*, 182 F.3d 1177, 1192 (10th Cir. 1999).

　　　While the government's due process obligation to disclose exculpatory evidence is

generally understood, case law provides less certainty on the issue of timing, and whether or to

what extent the court's materiality analysis should change depending on when *Brady* issues

surface.  My research has not revealed any controlling authority that establishes a definitive

point in time for disclosing exculpatory information.  Due process requires that *Brady* material

be disclosed "before it is too late for the defendant[ ] to make use of any benefits of the

evidence."  *United States v. Scarborough*, 128 F.3d 1373, 1376 (10th Cir. 1997), quoting *United

States v. Warhop*, 732 F.2d 775, 777 (10th Cir. 1984).  *Cf. United States v. Higgins*, 75 F.3d 332,

335 (7th Cir. 1996) (suggesting that because *Brady* is a disclosure rule, rather than a discovery

---

[10]Indeed, the Supreme Court conceded that *Brady* "requires less of the prosecution than the ABA Standards of Criminal Justice, which call generally for prosecutorial disclosures of any evidence tending to exculpate or mitigate."  *Kyles v. Whitley*, 514 U.S. 419, 437 (1995).

rule, "[d]isclosure even in mid-trial suffices if time remains for the defendant to make effective use of the exculpatory material"). *See also United States v. Rogers*, 960 F.2d 1501, 1510 (10th Cir. 1992) (holding that "[t]he *Brady* rule is not violated when the material requested is made available during trial"). However,

> It would eviscerate the purpose of the *Brady* rule and encourage gamesmanship were we to allow the government to postpone disclosures to the last minute, during trial. . . . [T]he belated disclosure of *Brady* material "tend[s] to throw existing strategies and [trial] preparation into disarray." It becomes "difficult [to] assimilate new information, however favorable, when a trial already has been prepared on the basis of the best opportunities and choices then available."

*United States v. Burke,* 571 F.3d 1048, 1054 (10th Cir. 2009) (holding that the belated disclosure of exculpatory information favorable to the defendant violates due process when "an earlier disclosure would have created a reasonable doubt of guilt") (internal citations omitted). *Cf. United States v. McVeigh*, 954 F. Supp. 1441, 1449 (D. Colo. 1997) (holding that prosecutors should disclose *Brady* material "as it becomes known to the government, since the information and material must be available to the defense in sufficient time to make fair use of it").

There is also a split of opinion as to whether the timing of a *Brady* request should alter the court's application of the materiality standard. In *Agurs*, 427 U.S. at 108 , the Supreme Court observed that the "same [due process] standard must apply" whether the defendant makes a *Brady* request in advance of trial or the issue surfaces after trial. However, the Court also conceded that there is a "significant practical difference" between the pretrial decision of the prosecutor and post-trial review by the courts. *Id.* While the government is not required to provide the defendant with unlimited discovery of all information known by the prosecutor, "if a substantial basis for claiming materiality exists, it is reasonable to require the prosecutor to respond either by furnishing the information or by submitting the problem to the trial." *Id.* at

106.  By logical extension, it also follows that the prosecutor would provide the court with more than a conclusory disclaimer of materiality, but rather should advance an argument that cites controlling precedent and salient facts.

Lower courts have taken conflicting positions on the timing/materiality issue.  Some courts have held that the materiality element of *Brady* should be dropped in the pretrial context, and that the court should require disclosure simply on a finding that the information in question relates to guilt or punishment.  *See, e.g., United States v. Carter*, 313 F. Supp. 2d 921, 925 (E.D. Wis. 2004) and cases cited therein.  This line of cases reasons that during the pretrial phase of the litigation,

> The judge cannot know what possible effect certain evidence will have on a trial not yet held.  In most cases, the judge will have only a vague approximation of what the proof will be; thus, he cannot meaningfully evaluate how the addition of other evidence will alter the trial.  Therefore, the court should ordinarily require the pre-trial disclosure of all exculpatory or impeachment evidence.

*Id.  See also United States v. Acosta*, 357 F. Supp. 2d 1228, 1231-1233 (D. Nev. 2005) ("Simply because 'material' failures to disclose exculpatory evidence violate due process does not mean only 'material' disclosures are required."); *United States v. Safavian*, 233 F.R.D. 12, 16-17 (D.D.C. 2005) ("The prosecutor cannot be permitted to look at the case pretrial through the end of the telescope an appellate court would use post-trial.").

Other courts have held that the materiality standard is controlling even if the *Brady* request is made in advance of trial.  *See, e.g., United States v. Coppa,* 267 F.3d 132, 138 (2d Cir. 2001); *United States v. Causey*, 356 F. Supp. 2d 6781, 695-96 (S.D. Tex. 2005).  *Cf. United States v. Beckford*, 962 F. Supp. 804, 811 (E.D. Va. 1997) (where *Brady* issues arose before trial in a capital murder case, concluded that "the same standards logically apply to both an initial

decision to disclose and a postconviction determination of whether nondisclosure deprived a defendant of his or her due process rights at trial").  District courts in the Tenth Circuit have rejected an expansive application of *Brady* that would remove the materiality requirement for a pretrial motion, suggesting that such an approach would be tantamount to "a broad or blind fishing expedition among documents possessed by the Government."  *See, e.g., United States v. Padilla*, 2010 WL 4337819, at *4-5 (D.N.M. Sept. 3, 2010); *United States v. Weiss*, 2006 WL 1752373, at *3-4 (D. Colo. June 21, 2006).  *See also United States v. Uphoff*, 907 F. Supp. 1475, 1477 (D. Kan. 1995) (in granting in part the defendant's pretrial motion for discovery, held that under *Brady* the "defendant has the burden to prove both that the evidence is favorable and material").

I am also aware that application of the *Brady* rule in this case occurs against the backdrop of the government's notice of intent to seek the death penalty.  In the past, the Supreme Court has observed that "virtually no limits are placed on the relevant mitigating evidence a capital defendant may introduce concerning his own circumstances."  *Payne v. Tennessee*, 501 U.S. 808, 822 (1991).  *See also Gregg v. Georgia*, 428 U.S. 153, 204 (1976) (observing that "it [is] desirable for the jury to have as much information before it as possible when it makes the sentencing decision" in a death penalty case); *United States v. McVeigh*, 944 F. Supp. 1478, 1487 (D. Colo. 1996) ("There can be no limit on the ability of individual jurors to consider mitigating factors").  However, in a more recent decision, the Supreme Court noted that while the relevance threshold applicable to mitigating evidence in a capital case is low, relevant mitigating evidence should still "tend logically to prove or disprove some fact or circumstance which a fact-finder could reasonably deem to have mitigating value."  *Tennard v. Dretke*, 542

U.S. 274, 284-85 (2004), quoting *McKoy v. North Carolina*, 494 U.S. 433, 440 (1990).  "This

wide berth for the admission of mitigating evidence, . . . 'does not mean that the defense has

*carte blanche* to introduce any and all evidence that it wishes.'"  *United States v. Lighty*, 616

F.3d 321, 363 (4th Cir. 2010), quoting *United States v. Purkey*, 428 F.3d 738, 756 (8th Cir. 2005).

With passage of the Federal Death Penalty Act in 1994, Congress made clear that during

the penalty phase of a capital case, the jury "shall consider any mitigating factor" and "any other

circumstance of the offense that mitigate[s] against imposition of the death sentence."  18 U.S.C.

§ 3592(a).  *See also* 18 U.S.C. § 3593(c) (providing that "[a]t the sentencing hearing,

information may be presented as to any matter relevant to the sentence, including any mitigating

or aggravating factor permitted or required to be considered under section 3592" and "the

defendant may present any information relevant to a mitigating factor").

However, Congress imposed some limits on the parties' ability to present aggravating or

mitigating evidence.  During the penalty phase of a capital case,

> Information is admissible regardless of its admissibility under the rules governing
> admission of evidence at criminal trials except that information may be excluded
> if its probative value is outweighed by the danger of creating unfair prejudice,
> confusing the issues, or misleading the jury.

18 U.S.C. § 3593(c).  *See also United States v. Henderson*, 485 F. Supp. 2d 831, 856 (S.D. Ohio

2007) (noting that the exclusionary language in 18 U.S.C. § 3993(c) "is, in fact, broader in scope

than the analogous exclusionary provision in Federal Rule of Evidence 403, which excludes

evidence where its probative value must be *substantially* outweighed, not just 'outweighed' – by

prejudicial concerns") (emphasis in original).  While it is difficult to imagine how mitigating

evidence would "creat[e] unfair prejudice" to the government during the penalty phase, the

Federal Death Penalty Act certainly acknowledges the possibility that even during the penalty

phase of the proceedings, proffered information could be so dissimilar or tangential to the

defendant or the circumstances of the pending case as to be confusing or misleading to the jury.

As noted, Request No. 66 seeks "[a]ny and all documents relating to inmate-on-inmate

stabbings in BOP institutions from August 10, 1998 through December 31, 2010, including

without limitation, documents relating to inmates who suffered multiple stab wounds but did not

die from those wounds."  Defense counsel suggests that Request No. 66, like many of Mr.

Watland's other requests, "relate[s] to the violent conditions facing Mr. Watland at USP

Florence . . . [and] is potentially related to Mr. Watland's state of mind at the time of the alleged

murder."  Defendant further contends that "[a]ll of the items requested are relevant to any

penalty phase trial that may be held, because they relate to the circumstances of the alleged

offense."  *See* Defendant's Motion for Discovery, at 4-5.  Addressing specifically the

information encompassed by Request No. 66, defense counsel has suggested that

> A picture is worth a thousand words.  The defense believes that photographs of
> inmates who have recently survived being inflicted with multiple stab wounds
> would necessarily be significantly more persuasive to a jury than dry statistical
> data.  The circumstances of the charged offense . . . are that Mr. Watland killed
> Mr. Baker by stabbing him multiple times.  The government has indicted Mr.
> Watland for Murder in the First Degree, which requires the government to prove
> that Mr. Watland killed Mr. Baker "with premeditation."  The requested material
> would tend to refute that Mr. Watland had the requisite intent to commit the
> charged crime.  Additionally, this material is relevant to several statutory and
> non-statutory aggravators set forth in the special findings in the Indictment, as
> well as in the government's "Notice of Intent to Seek the Death Penalty."

*See* Reply to "Response by Government to Motion for Discovery" (doc. #133), at 28.

During the hearing before Judge Kane on August 9, 2011, defense counsel elaborated on

the materiality of the information sought by Request No. 66, suggesting that the requested

information would be material to Mr. Watland's state of mind on August 10, 2008.

[A]gain, what we anticipate we are going to see in a penalty phase here, Your Honor, is the court – the jury and the Court will be seeing videotape of Mr. Watland stabbing Mr. Baker multiple time, both while he is sitting and while he is on the floor bleeding.  And the Government can be anticipated to argue, as aggravation, that the crime was particularly aggravated because of those multiple stabbings.

Your Honor, we, again, need to be able to rebut that aggravation at penalty to show that, you know what, this is – in the BOP, there are some big guys, and there are some big guys who have been stabbed eight times, ten times, twenty times who live to tell about it, who live to commit other crimes, who live to retaliate.  If Mr. Watland were operating under his fear of Mr. Baker and felt like he was in a kill or be killed situation, it's reasonable to think that Mr. Watland stabbed Mr. Baker multiple times to make sure he was dead and the threat would be gone, as opposed to simply committing a heinous, aggravated crime that is – that involves a degree of senseless violence that is the kind of thing the jury might impose the death penalty for.

See Transcript of August 9, 2011 Motion Hearing (doc. #167), at 37-38.  *See also McVeigh*, 954 F. Supp. at 1451 (observing that defense counsel must be prepared to provide the court with sufficient information to enable the court to make a materiality evaluation).[11]

Given the current state of the record, I find there is a "reasonable probability" that information concerning inmate-on-inmate stabbings might have a favorable impact on the jury's deliberations; if not on liability, then certainly during the penalty phase of the proceedings.[12]

---

[11]*Cf. Laube v. Haley,* 234 F. Supp. 2d 1227, 1247 (M.D. Ala. 2002) (in granting a preliminary injunction requested by the plaintiff inmates, the court observed that a "'kill or be killed' mentality" could develop where inmates are left to believe that guards cannot protect them and inmates "ask themselves if they should attack other inmates so as to preempt potential attackers").  *But see United States v. Slocum*, 486 F. Supp. 2d 1104, 1109 (C.D. Cal. 2007) (rejecting the defendant-inmates' theory of "preventive self-defense, a concept that finds no support in state or federal law").

[12]The United States implicitly concedes this point, having agreed to produce some information in response to Request No. 66.  The dispute currently surrounding Request No. 66 appears to be directed to the scope of that request, not the materiality of inmate-on-inmate information *per se.*

The Federal Death Penalty Act includes as a mitigating factor that the defendant "was under unusual and substantial duress, regardless of whether the duress was of such a degree as to constitute a defense to the charge."[13]  18 U.S.C. § 3592(a)(2).  Some guidance can gleaned from the Sentencing Guidelines which recognize that a downward departure may be warranted "if the defendant committed the offense because of serious . . . duress, under circumstances not amounting to a complete defense."  *See* USSG § 5K1.12.  The departure permitted under 5K2.12 "is broader than the defense of duress, as it does not require immediacy of harm or inability to escape, and allows the court to consider the subjective mental state and personal characteristics of the defendant in its determination."  *United States v. Nava-Sotelo*, 232 F. Supp. 2d 1269, 1281 (D.N.M. 2002), quoting *United States v. Henderson-Durand*, 985 F.2d 970. 976 (8th Cir. 1993).  *Cf. United States v. Pestana*, 2011 WL 4000841, at *7 (S.D.N.Y.  Sept. 8, 2011) (while noting that a duress defense is not available where there is a reasonable opportunity to seek intervention by the appropriate authorities, evidence of the defendant's subjective mental state could be considered as a mitigating factor in determining the defendant's sentence).  *But see United States v. Sachdev*, 279 F.3d 25, 29 (1st Cir. 2002) (holding that USSG 5K2.12 requires not only that the defendant subjectively believed a threat had been made, but also that "a reasonable person *in defendant's position* would perceive there to a threat, explicit or implicit, of physical injury . . .

---

[13]*But see United States v. Nwoye*, 663 F.3d 460 , 462 (D.C. Cir. 2011) (holding that the defense of duress is only available to a defendant who shows they acted "under an unlawful threat of imminent death or serious bodily injury" and under circumstances that prevented "any reasonable, legal alternative to committing the crime"); *United States v. Vigil*, 743 F.2d 751, 756 (10th Cir. 1984) (the "defense of necessity" must be based on a real emergency; it "may be asserted only by a defendant who was confronted with a crisis as a personal danger, a crisis that did not permit a selection from among several solutions, some of which would not have involved criminal acts").

resulting from the unlawful action of a third party") (emphasis added).  *Cf. United States v. Johnson*, 956 F.2d 894, 899 (9th Cir. 1992) (in considering a downward departure under 5K2.12, the court "is not confined to the classical definition of duress, but should properly consider the individual before the court and *[his] particular vulnerability*") (emphasis added).

Although Mr. Watland has made a materiality showing to support Request No. 66 and Judge Kane granted the motion "requiring" prosecutors to produce enumerated items of discovery and *Brady* material, the government holds fast to its view that the likely net effect of all the requested information does not reach the "reasonable probability" threshold that would mandate disclosure.  *Cf. United States v. Lujan*, 530 F. Supp. 2d at 1230 (noting that while the government "typically is the sole judge of what evidence in its position is subject to disclosure" under *Brady*, "it acts at its own peril by failing to comply adequately with an order requiring disclosure of *Brady* material"), quoting from *United States v. Presser*, 844 F.2d 1275, 1281 (6th Cir. 1988).

In resolving the instant motion, I find instructive Judge Matsch's observations in *McVeigh,* 954 F. Supp. at 1451-52.[14]

> The complexities of this case make it understandable that counsel for both parties want the court to function as an intermediary . . . to referee their disagreements about materiality and supervise the exchange of information.  As previously explained, that is not the judicial role. . . . the continuing duty of discovery under Rule 16(a) and the constitutional mandate to be informed of and produce exculpatory information and material under *Brady* make discovery a dynamic process and preclude any adjudication that there has been adequate compliance at any time before trial or, indeed, during trial, when, as here, both parties are conducting ongoing investigations. . . . There is a continuing duty of disclosure both under Rule 16 and *Brady*.  The court expects counsel for both parties to

---

[14]Both sides have had occasion in the past to direct the court's attention to the *McVeigh* decision.

review their positions and adjust them according to the definitions and guidance provided to them in this opinion.

*Cf. United States v. McVeigh*, 923 F. Supp. 1310, 1313 (D. Colo. 1996) ("[F]or the court to determine what specific disclosures are required under *Brady* would necessitate a complete review of all the material gathered during the government's investigation.  The court does not have that duty.").  Having taken a seemingly inflexible position in the exercise its discretion under *Brady*, the government now wishes to hedge its bet by inviting a sanction that would permit an interlocutory appeal.  That course of action would in all likelihood compromise the current trial date of March 4, 2013.

I believe that the government's motion for sanctions is both premature and mis-characterized.  As the court noted in *United States v. Perez*, 222 F. Supp. 2d 164, 168 (D. Conn. 2002), the "scope of the Government's *Brady* obligations, far from being static, can change during the course of the prosecution."  The government has the burden, throughout the pretrial process, to "make a prediction . . . as to how the nondisclosure of favorable evidence will be viewed after trial."  *United States v. Coppa*, 267 F.3 at 143 (suggesting that the prosecutor should make a "*careful prediction* as to when the 'point of reasonable probability' is reached" and repeating the Supreme Court's caution that "a prosecutor 'anxious about tacking too close to the wind will disclose a favorable piece of evidence'") (emphasis added).  In the final analysis, the government's obligation under *Brady* is to disclose favorable evidence on a timely basis.  *But see Burke*, 571 F.3d at 1056 ("not every delay in disclosure of *Brady* materials is necessarily prejudicial to the defense").  While the government's posture with respect to Request No. 66 may ultimately prove to be ill-advised and shortsighted, at this point in the pretrial process, this court is not in a position to determine whether or to what extent a *Brady* violation may occur at

trial.  Certainly, the March 4, 2013 trial date gives the government time to reconsider the wisdom of its position.

I also believe that the government's request for sanctions incorrectly frames the issue for decision.  The disclosures required by *Brady* and its progeny ensure a proceeding that comports with the standards of justice.  *Cf United States v. Touchet*, 2008 WL 239169, at *2 (M.D. Fla. 2008) (noting that "[t]he object of a remedy" in the wake of a *Brady* violation "is not to punish government misconduct but to ensure a reliable trial").  When and if the government fails to comply fully with its due process obligations, the court must select a "remedy" that is consistent with the prejudice, if any, caused by the government's untimely disclosures.  *United States v. Coppa*, 267 F.3 at 143 (suggesting that the remedy for a breach of the government's *Brady* obligation should be linked to the scope of the disclosure obligation).  *See also Burke*, 571 F.3d at 1056 ("To justify imposition of a remedy, the defense must articulate to the district court the reasons why the delay should be regarded as materially prejudicial.").  The Tenth Circuit has explained that

> Where the district concludes that the government was dilatory in its compliance with *Brady*, to the prejudice of the defendant, the district court has the discretion to determine *an appropriate remedy*, whether it be exclusion of the witness, limitations on the scope of permitted testimony, instructions to the jury, or even mistrial.  The *choice of remedy* is in the sound discretion of the district court.

*Id* at 1054 (emphasis added).

While I recommend that the United States' motion be denied, I offer the following comments for counsels' consideration.

> A fair trial is the constitutional imperative.  Achieving that objective requires good faith and responsible conduct by competent trial advocates on both sides.  Cooperation in a search for truth is not inconsistent with zealous advocacy.

27

*McVeigh*, 954 F. Supp. at 1451-52.  The dispute involving Request No. 66, and by extension

other comparable discovery requests, seems to be spurred by intractable advocacy on both sides.

Although Request No. 66 subsumes information that should be produced under *Brady*,

the Request as drafted is patently overbroad.  This Request seeks information and documents

concerning events that occurred some ten years before Defendant was transferred into the

custody of the Federal Bureau of Prisons; events that presumably occurred well beyond the ken

of Mr. Watland.  *Id.* at 1451 (observing that any assessment of materiality depends upon many

factors including "the relevance or 'fit'" of the desired information in the context of the

historical narrative).  The breadth of Request No. 66 becomes even more apparent when

compared to the narrower temporal scope of Request Nos. 35 and 36, which seek

> 35.  Any and all documents relating to reports of Code 101 violations within
> BOP from August 10, 2005 through August 10, 2008, including graphs,
> supporting data, supporting documentation.

> 36.  Any and all documents relating to reports of Code 104 violations within
> BOP from August 10, 2005 through August 10, 2008, including graphs,
> supporting data, supporting documentation.[15]

---

[15]A "Code 101" violation would include "assaulting any person . . . when serious physical injury has been attempted or accomplished," while a "Code 104" violation would involve the "possession, manufacture or introduction of a . . . sharpened instrument, knife . . . or any instrument used as a weapon."  *See* Exhibit (doc. #614-1) attached to Mr. Watland's Reply to Government's Response to Motion to Compel Forthwith Production of Discovery and *Brady* Materials and Information Responsive to the Court's August 9, 2011 Order Granting Request Nos. 35 and 36 (doc. #614).  At the very least, there would appear to be significant overlap between Request No. 66 (seeking all documents relating to inmate-on-inmate stabbings) and Request No. 35 (directed to all documents relating to assaults where serious injury was attempted or accomplished).  During the August 9, 2011 hearing, defense counsel argued that "Code 101 violations are serious assaults" and that the "defense must be allowed to access the information necessary to show the jury just how dangerous federal prisons are."  Given Mr. Watland's particular circumstances and criminal history, the "dangerousness" of BOP prison camps and medium security facilities does not appear to be particularly relevant to the jury's deliberations.  Defense counsel has argued that documents relating to Code 104 violations are

Similarly, Mr. Watland's Request No. 37 seeks "any and all BOP After-Action Reports prepared from August 10, 2005 through August 10, 2008."  Defense counsel has explained that these reports of internal investigations of significant incidents occurring at BOP facilities "are material to the preparation of Mr. Watland's defense and may contain *Brady* material and information."

> Information provided in discovery indicates that Mr. Baker . . . had a history of assaulting and extorting other inmates and . . . had threatened Mr. Watland, placing Mr. Watland in a "kill or be killed" situation.  The defense must be allowed to access the information necessary to show the jury just how dangerous federal prisons are. . . . One of the reasons the defense needs to obtain the After-Action Reports for the BOP nationally is in order to obtain documentation of violence that was occurring at USP Beaumont during that time period and how that level of violence compared with other federal prisons around the country. The defense needs this information in order to be able to credibly explain to the jury why someone such as Mr. Watland – a boarder from the State of Maine who had never before spent a day in a federal prison – was justifiably terrified of being sent to either one of the worst or the worst federal prison there was in terms of inmate safety . . .

See Defendant's Reply to "Response by Government to Motion for Discovery," at 17-18.[16]  It

---

"relevant material in *Brady*" to show the jury "that the institution is awash in weapons."  Even assuming *arguendo*, that the prevalence of weapons at USP Florence is mitigating evidence in this case, it is difficult to see how reports concerning weapons at all BOP facilities would be in any way relevant to this case.

[16]Defense counsel elaborated on the materiality of Request No. 37 during oral argument on August 9, 2011:

> These after-action reports . . . contain a wealth of information about the BOP's own analysis of what went wrong when an inmate-on-inmate homicide or other inmate-staff homicide or other kind of serious riot-life incident occurs.  It provides a wealth of information that the jury is entitled to know about the running of that institution, about institutional failure, about potential BOP negligence, about what could have been done differently.

*See* Transcript of Proceedings on August 9, 2011, at 24-25.

would appear that the government has not withheld information responsive to Request Nos. 35, 36 and 37 based upon the temporal scope of those requests. *See* Exhibit 1 (doc. #512-1), at page 27 of 48, attached to Government's Motion Requesting Sanction for Non-Compliance.

Read literally, Request No. 66 requires the government to produce all documents (however tangentially connected) to all inmate-on-inmate stabbings (whether serious or minor), at any Bureau of Prison institution (regardless of its security designation).[17]  This Request makes no allowance for significant differences in the inmate populations, housing arrangements, and security measures that characterize the various types of correctional facilities maintained by the Bureau of Prisons.  In the past, defense counsel have suggested that Request Nos. 35, 36, 37 and 66 relate to "the violent conditions facing Mr. Watland at USP Florence" and "Mr. Watland's state of mind at the time of the alleged murder."  Even when considered in light of *Brady*, its progeny and the low threshold for establishing the relevance of mitigating evidence in a capital case, I am hard-pressed to understand, and defense counsel has not proffered a persuasive explanation of how an inmate stabbing in August 1998 at a minimum security BOP facility would have influenced Mr. Watland's state of mind in August 2008.  *Cf. Bobby v. Van Hook*, 558 U.S. 4, 19 (2009) (in weighing the impact of potential mitigating evidence, noted there comes a point when evidence or testimony "can reasonably be expected to be only cumulative").  Yet, Request No. 66 would require the government to produce any and all information "related"

---

[17]For example, a Bureau of Prisons "minimum security institution," such as a Federal Prison Camp, has "dormitory housing, a relatively low staff-to-inmate ratio, and limited or no perimeter fencing . . . [and is] work-and program-oriented."  In contrast, "high security institutes," such as United States Penitentiaries, "have highly secured perimeters . . . multiple- and single-occupant cell housing, the highest staff-to-inmate ratio, and close control of inmate movement."  *See* "BOP: Prison Types & General Information," at http://www.bop.gov/locations/institutions/index.jsp.

to a long-ago assault, including drafts of documents and handwritten notes that could have no

bearing on this Defendant's state of mind.  At some point, an event or information becomes so

attenuated as to fall outside the *Brady* disclosure requirement.  Given the scope of Request No.

66, there is a very real potential for confusing or misleading the jury.

Mr. Watland justifies the expansive phraseology in his discovery requests by suggesting

that the phrase "any and all documents relating to" a specified topic "is commonly employed in

discovery requests in criminal and civil cases in federal and state courts."[18]  To the contrary, the

"relating to" formulation has been criticized in several reported decisions.  *See, e.g., Robinson v.*

*City of Arkansas City, Kansas*, 2012 WL 603576, at *9 (D. Kan. Feb. 12, 2012) ("Use of

omnibus phrases such as 'relating to' often makes a request overly broad when the phrase

modifies all documents, rather than a specific type of document."); *Trustees of Springs Transit*

*Co. Employee's Retirement and Disability Plan v. City of Colorado Springs*, 2010 WL 1904509,

at *5 (D. Colo. May 11, 2010) (in addressing requests for production that seek all documents

"relating to" a particular subject, the court suggested that it would be difficult to imagine what

documents would not be swept up by such a request); *In re Urethane Antitrust Litigation*, 2008

WL 110896, at *1 (D. Kan. Jan. 8, 2008) (holding that a discovery request is overly broad and

unduly burdensome on its face if it uses an "omnibus term such as 'relating to'" to modify a

large range of documents because "such broad language 'make[s] arduous the task of deciding

which of numerous documents may conceivably fall within its scope'"); *Sonnino v. University of*

---

[18]An attorney in a civil case also faces the possibility of sanctions under Fed. R. Civ. P. 26(g)(1)(B) (counsel is certifying that a discovery request is consistent with existing law, not interposed for an improper purpose, and is neither unreasonable nor unduly burdensome considering the needs of the case and the importance of the issues at stake in the case).

*Kansas Hospital Authority*, 2004 WL 764085, at *5 (D. Kan. Apr. 8, 2004) (held that discovery

requests that sought "all documents that relate or concern" a particular subject were "either

excessively vague or overbroad in scope").  *See also United States v. Padilla*, 2010 WL

4337819, at *5 (D.N.M. Sept. 3, 2010) (noting that an expansive interpretation of the

government's pretrial disclosure obligations under *Brady* would equate to the standard employed

in civil discovery).

Addressing the same issue in the criminal litigation context, a court noted that in the

*Brady* context, the Supreme Court has adopted

> a flexible, sliding scale approach to assessing . . . materiality . . . [T]he specificity
> of the request [for production] is inversely related to the prosecution's disclosure
> obligation.  As the specificity of the defendant's request increases, a lesser
> showing of materiality will suffice to establish a violation.  Conversely, as the
> defendant's request becomes more general or even nonexistent, a greater showing
> of materiality is required to establish a *Brady* violation.

*United States v. Anderson*, 31 F. Supp. 2d 933, 940 (D. Kan. 1998), quoting *Smith v. Secretary of*

*New Mexico Department of Corrections*, 50 F.3d 801, 827 (10th Cir. 1995).  *See also*

*Beckford*, 962 F. Supp. at 826 (denying, in part, the defendants' pretrial *Brady* motion after

concluding that "the defense requests are overbroad" and created "the prospect of an 'evidentiary

free-for-all' at the sentencing hearing").  *United States v. Weiss*, 2006 WL 1752373, at *6 (D.

Colo. June 21, 2006) (in denying defendants' *Brady* requests, cautioned that "the discovery

burden on the Government cannot be 'unduly burdensome' and discovery requests must be

'sufficiently specific . . . to show the Government what it must produce"); *United States v.*

*Safavian*, 233 F.R.D. 12, 18 (D.D.C. 2005) (although the court took an expansive view of the

government's pretrial disclosure obligations under *Brady*, it refused to require production in

response to discovery requests that were unreasonable and lacked the required particularity);

*United States v. Feliciano*, 998 F. Supp. 166, 173 (D. Conn. 1998) (defendants moved for discovery of evidence in mitigation of a potential death penalty; in denying those requests as overbroad, the court held that defendants "[had] not met the burden of establishing a substantial basis for claiming that this mitigator will apply at the penalty phase"). "There is an obligation of fairness required of defense counsel in making requests for information from the government. These requests must be sufficiently clear and directed to give reasonable notice about what is sought and why the information may be material in the case." *McVeigh*, 954 F. Supp. at 1451.[19]

To date, the government's response to Request No. 66 has been both over- and under-inclusive. Indeed, the government's production under Request No. 66 seems to be wholly arbitrary. *See Agurs*, 427 U.S. at 111 (cautioning that "the attorney for the sovereign" must temper the zealous prosecution of the accused with "his client's overriding interest that 'justice shall be done.'") (citing *Berger v. United States*, 295 U.S. 78, 88 (1935). Although it is not immediately apparent to this court how inmate stabbings at the minimum security facilities in Florence and Englewood, Colorado would shed light on Mr. Watland's state of mind on August 10, 20008, the government has provided that information.

Yet, the United States adamantly refuses to produce information regarding inmate stabbings at USP Beaumont, even though Mr. Watland was incarcerated in that institution from

_____

[19]This court is mindful of Judge Matsch's observation that "the failure to comply with a constitutional command to present evidence fairly at trial is not excused by any inconvenience, expense, annoyance or delay." *McVeigh*, 954 F. Supp. at 1450. While I take no issue with that re-affirmation of a defendant's due process rights, Judge Matsch was not asked to weigh the burdens associated with responding to an overbroad discovery request in combination with the potential for "confusing the issues, or misleading the jury." *But see United States v. McVeigh*, 923 F. Supp. at 1314 (citing *United States v. Poindexter*, 727 F. Supp. 1470, 1481 (D.D.C. 1989) for the proposition that discovery requests could be so "extraordinarily burdensome" as to be "not called for without a persuasive showing of the materiality of the evidence sought").

January 28 to June 10, 2008.  At thus juncture, there is reasonable probability that information

on inmate stabbings at USP Beaumont would tend logically to shed light on Mr. Watland's state

of mind or his perception of the danger posed by Mr. Baker.  Similarly, information about

inmate-on-inmate stabbings in other United States Penitentiaries during the period from August

10, 2005 to August 10, 2008, might be material to Mr. Watland's claim that he perceived a

serious threat to his personal safety and was left with no choice but to "kill or be killed."  While

the foregoing comments are not intended to finally adjudicate the parties' *Brady* disputes, they

may provide some focus as the case moves forward to trial.

Accordingly, for the foregoing reasons, I RECOMMEND that the United States' Motion

Requesting Sanction for Non-Compliance (doc. #512) be DENIED.

DATED this 16th day of November, 2012.

BY THE COURT:

s/ Craig B. Shaffer
United States Magistrate Judge